IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**R.C. CRUM,**

Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY,**

Respondent.

Case Number 1:13cv2479

Judge Lesley Wells

Magistrate Judge James R. Knepp, II

REPORT AND RECOMENDATION

## INTRODUCTION

Plaintiff R.C. Crum seeks judicial review of Defendant Commissioner of Social Security's decision to deny Child's Insurance Benefits ("CIB") and Supplemental Security Income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405 (g) and § 1383 (c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated November 7, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

By way of background, Plaintiff previously filed an application for CIB under Title II of the Social Security Act on September 16, 2008, and for SSI under Title XVI on August 18, 2008. (Tr. 19). Those applications were denied. (Tr. 19). He filed another application for SSI on August 10, 2009, which was denied on February 19, 2010. (Tr. 19, 124). Plaintiff did not appeal these decisions and the instant ALJ did not find conditions or good cause to reopen. (Tr. 19).

On October 13, 2010, Plaintiff filed applications for CIB and SSI claiming he was disabled since January 1, 1993 due to a learning disability and bullet wounds in his leg and

stomach. (Tr. 19, 217, 223, 270). Plaintiff's CIB claim was based on the death of his father, the wage earner. (Tr. 19, 39). His claims were denied initially and on reconsideration. (Tr. 127, 130, 137, 144). Plaintiff then requested a hearing before an administrative law judge ("ALJ") (Tr. 151) and amended his alleged disability onset date to April 3, 2007 (Tr. 19, 237). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 16, 34). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 7); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On November 7, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### *Plaintiff's Background, Vocational Experience, and Daily Activities*

Born February 1, 1989, Plaintiff was eighteen years old on his alleged onset date. (Tr. 27, 237). Plaintiff has a tenth grade education, was enrolled in special education classes, and has no past relevant work experience. (Tr. 27, 43, 46).

Plaintiff lived with his mother and two sisters. (Tr. 45, 306). With regard to daily activity, Plaintiff washed dishes, mopped the floor, cleaned the bathroom, washed his clothes, picked up litter in the yard, raked leaves, shopped, played cards, watched television, sang in a men's choir, prepared frozen meals or sandwiches, and talked on the phone. (Tr. 48-49, 308-10, 505-06). He had a valid driver's license and four children who did not live with him but saw him every day. (Tr. 47, 49). Occasionally, Plaintiff watched his children at his mother's house. (Tr. 50). Previously, Plaintiff was arrested for assault, robbery, and theft. (Tr. 52-53). At the time of the hearing, Plaintiff was on probation and met with his parole officer once per month. (Tr. 52-54). Plaintiff said he could read and understand parts of a newspaper or a simple note and could add

and subtract. (Tr. 55-56). He could take the bus so long as he did not have to change lines. (Tr. 62). Plaintiff's mother cooked and grocery shopped for him, but he thought he could get by without her. (Tr. 56). Due to a gastrointestinal condition related to being shot in the stomach, Plaintiff said he could only eat oatmeal and candy. (Tr. 56-57).

***Education Records***

Plaintiff was placed in a cognitive disabilities program in 1998. (Tr. 259). At age fifteen, Plaintiff's school psychologist, Luigina Di-Nardo, oversaw an Evaluation Team Report. (Tr. 320). As part of that report, Ms. Di-Nardo reviewed Plaintiff's 1997 Weschler Intelligence Scale for Children – 3rd Edition testing, which indicated Plaintiff had a full scale IQ score of 77, and said Plaintiff appeared to be in the borderline range of ability level. (Tr. 321). Based on her review of Plaintiff's records, Ms. Di-Nardo found Plaintiff had deficits in adaptive behavior in independent living, social skills, and language/concepts. (Tr. 321).

In tenth grade, from 2007 to 2008, Plaintiff was under an Individualized Education Program ("IEP"), with the goal of improving his abilities regarding numbers, number sense, operations, reading applications, and literary text analysis. (Tr. 242-45). Plaintiff took the Kaufman Brief Intelligence Test-II on May 15, 2008, where the examiner found Plaintiff had a verbal IQ of 69, composite score of 71, and a 90% chance that his true IQ score would be within the range of 65-79. (Tr. 260). Plaintiff's special education teacher indicated Plaintiff accepted supervisory authority and cooperated with others. (Tr. 261). Additionally, he said Plaintiff's gross and fine motor skills were normal, he could work independently, complete classroom work, follow verbal, written, multi-step directions, and plan and organize. (Tr. 260-61).

***Relevant Medical Evidence***

Plaintiff sustained a gunshot wound to the abdomen on April 3, 2007, for which he

underwent an exploratory laparotomy for resection of the colon with anastomosis and an incidental appendectomy. (Tr. 373-405). At a follow-up visit in May 2007, the wound had completely healed and Plaintiff was told he could resume full activity. (Tr. 399).

Plaintiff suffered a second gunshot wound on September 14, 2007, this time to his leg. (Tr. 396). However, he did not follow-up after the initial emergency room visit, rather, at a subsequent office visit to address a sexually transmitted disease ("STD"), he told the treatment provider he kept the wound clean with peroxide and an ACE bandage. (Tr. 396). Plaintiff said he was working on getting a GED and getting his life together. (Tr. 396).

On December 28, 2007, Plaintiff was admitted to the hospital with complaints of abdominal pain. (Tr. 394-95). He left the following day against medical advice. *Id*. Later, Plaintiff said he left because he was scared he would have more surgery or end up with a colostomy bag. (Tr. 390).

In 2008, Plaintiff's only medical treatment of record was for an STD check. (Tr. 390). He complained of recurrent abdominal pain but said he was having bowel movements without blood in the stool and could eat. (Tr. 390).

In 2009, Plaintiff complained of cough and chest congestion and was diagnosed with pneumonia but described as "generally in overall good health". (Tr. 437).

On December 3, 2009, Plaintiff was found unresponsive by EMS after taking two unknown pills, purportedly to relieve abdominal pain. (Tr. 421-22).

At a pain management appointment on January 6, 2010 to address abdominal pain, Plaintiff's physical examination was unremarkable and the treatment provider prescribed Neurontin and Tramadol. (Tr. 413-14).

On March 5, 2010, Plaintiff saw his primary care physician, Erron L. Bell, M.D., with

complaints of recurring abdominal pain and constipation. (Tr. 478). Examination revealed mild tenderness in the right lower quadrant and left lower quadrant of his abdomen. (Tr. 478). An x-ray of Plaintiff's abdomen revealed no obstruction nor free air. (Tr. 542).

In October 2010, Plaintiff saw Dr. Bell and told him he did not follow-up with general surgery. (Tr. 544). Plaintiff reported normal bowel movements and on examination, had no rebounding or guarding and normal bowel sounds. (Tr. 544). A CT scan of the abdomen showed no intraperitoneal free air or free fluid. (Tr. 546).

On November 1, 2010, Plaintiff said he wanted to wait on an enema study because his abdominal pain was not bad. (Tr. 551-52). He could walk independently and was cleared to return to work activity. (Tr. 551).

In January 2011, Plaintiff went to the emergency room for abdominal pain, vomiting, and constipation. (Tr. 555-57). The treating physician assessed chronic abdominal pain and constipation, adding Plaintiff was scheduled to have revision surgery in February but had missed a few appointments for evaluation of the procedure. (Tr. 557).

Plaintiff returned to the hospital in May 2011 with complaints of abdominal pain. (Tr. 623). Plaintiff said he only ate candy to avoid obstructive symptoms. (Tr. 623). Plaintiff indicated his symptoms usually resolved at the hospital with non-operative management. (Tr. 623). The treating physician assessed partial proximal small bowel obstruction and prescribed Neurontin and Tramadol. (Tr. 624-25).

In October 2011, Plaintiff reported for definitive treatment of his intermittent abdominal pain. (Tr. 572). At the time, his pain was rated at a zero out of ten and he said his symptoms were well controlled with Tramadol and Miralax. (Tr. 572). Following a generally unremarkable physical examination, the examiner recommended Plaintiff undergo a gastrograffin enema of his

colon as an outpatient. (Tr. 573).

Plaintiff returned to the emergency room on October 9, 2011 with complaints of sharp abdominal pain. (Tr. 577-78). He was admitted to surgery for small bowel obstruction and a nasogastric tube was placed. (Tr. 578). Plaintiff was discharged the same day as his symptoms had resolved. (Tr. 605).

On January 10, 2012, Dr. Bell completed a questionnaire, where he indicated Plaintiff suffered from abdominal pain with frequent obstruction. (Tr. 659). He said he last saw Plaintiff in October 2010 and thought Plaintiff could sit for eight hours per day, stand or walk for thirty minute intervals for a maximum of two hours in an eight-hour workday, lift up to twenty pounds, required fifteen minute breaks every two hours, and could be expected to miss four-to-five days of work per month due to his medical condition. (Tr. 659-60). On March 2, 2012, Dr. Bell highlighted Plaintiff's tendency to not follow-through with treatment recommendations. (Tr. 657-58).

***State Agency Review and Consultative Examinations***

Consultative Examiner Michael B. Leach, Ph.D., examined Plaintiff on December 9, 2009 and January 19, 2011. (Tr. 406, 501). In 2009, Dr. Leach found Plaintiff had a full scale IQ score of 70, placing him in the borderline range of intellectual disability. (Tr. 408-09). Dr. Leach interviewed Plaintiff, who told him he had four children by two mothers and saw his children regularly. (Tr. 407). Plaintiff lived with his mother, who supported him financially, and his siblings. (Tr. 407). Plaintiff had never been employed and was not looking for employment because he felt he was unable to work due to learning problems. (Tr. 407). Plaintiff had no trouble with concentration or memory but had a quick temper. (Tr. 407). Plaintiff had some

community problems, including assault charges as a juvenile, problems with aggression, and trouble getting along with siblings and peers. (Tr. 408).

In January 2011, Dr. Leach's testing revealed Plaintiff had a full scale IQ of 74, again placing him within the borderline range of intellectual ability. (Tr. 505). Dr. Leach concluded Plaintiff appeared "immature and simplistic in his thinking and behavior" and noted Plaintiff was "still dependent upon his mother to assist him with reading, counting money, and assisting [him] in making decisions regarding his future". (Tr. 506).

On January 26, 2010, state agency psychologist Bruce Goldsmith, Ph.D., reviewed Plaintiff's records and concluded Plaintiff suffered from borderline intellectual functioning and would be limited to simple, routine tasks with superficial interpersonal contact without strict time or production demands. (Tr. 454-70).

Willa Caldwell, M.D., a non-examining state agency consultant, reviewed Plaintiff's records on December 22, 2010 and concluded he did not have a severe impairment. (Tr. 77). Leslie Green, M.D., affirmed Dr. Caldwell's findings on September 2, 2011. (Tr. 102).

On February 17, 2011, state agency psychologist Patricia Semmelman, Ph.D., reviewed Plaintiff's records and concluded Plaintiff could perform simple, repetitive work tasks in an environment that did not rely on more than occasional interaction with others or strict, fast-paced production quotas. (Tr. 77-78, 92).

On August 20, 2011, state agency psychologist Irma Johnson, Psy.D., reviewed Plaintiff's records and concluded he could perform simple, routine tasks in an environment that did not require fast pace or frequent interactions with others. (Tr. 106-08, 120-22).

***ALJ Decision***

On June 27, 2012, the ALJ determined Plaintiff had severe impairments of a gastrointestinal disorder and borderline intellectual functioning. (Tr. 21). Next, she found Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (Tr. 21-23).

After considering the record, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations. (Tr. 23). The ALJ found Plaintiff could perform simple, routine tasks (unskilled work) and have superficial interpersonal contact with coworkers, supervisors, and the general public. (Tr. 23). However, Plaintiff's work activity could not include strict time or production demands and he needed to have oral instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting. (Tr. 23). Plaintiff could cope with ordinary and routine changes in a work setting that was not fast paced or of high demand and he would require a break every two hours for fifteen minutes at a time. (Tr. 23). Based on Plaintiff's age, education, work experience, and RFC, the ALJ determined Plaintiff could find work in the national economy as a cleaner, dishwasher, or laundry worker. (Tr. 27-28). Therefore, the ALJ found Plaintiff was not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for CIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?
2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's RFC and can he perform past relevant work?
5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five

to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if he satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529. [1]

## DISCUSSION

Plaintiff argues the ALJ erred by finding he did not meet listing impairment 12.05(C) – intellectual disability.[2] (Doc. 14). Plaintiff also argues the RFC is not supported by substantial evidence. (Doc. 14). Each argument is addressed in turn.

***Listing 12.05(C)***

The listings streamline the disability decision-making process by identifying people whose impairments are more severe than the statutory disability standard such that their impairments would prevent them from performing any gainful activity – not just substantial gainful activity – regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); Social Security Rule (SSR) 83-19, at 90)). The listings create a presumption of disability making further inquiry unnecessary. *Id.* Each listing establishes medical criteria, and to qualify for benefits under a listing, a claimant must prove his impairment satisfies all the listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530.

---

1. Ostensibly, the ALJ did not use the three-step process set forth in 20 C.F.R. § 416.924(a), which is typically used to assess childhood disability, because Plaintiff was not under age eighteen at the time of his amended alleged onset date.
2. Intellectual Disability replaced the term Mental Retardation in listing 12.05(C) effective September 3, 2013. 78 FR 46499-01 (Aug. 1, 2013).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

Here, Plaintiff claims he meets or medically equals listing 12.05(C). The diagnostic description of intellectual disability in 12.05 refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, § 12.05. To demonstrate intellectual disability, a claimant must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05(C) requires a claimant have a valid, verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

For the following reasons, the Court finds the ALJ erred in her treatment of the section C criteria. However, Plaintiff has not established the three diagnostic description factors and therefore, the ALJ's finding that Plaintiff did not meet listing 12.05(C) is supported by substantial evidence.

Plaintiff's challenge pertains to the part of listing 12.05(C) which requires a valid IQ score of 60 through 70. In support, Plaintiff directs the Court to allegedly qualifying IQ scores. Indeed, in 2009, Dr. Leach found Plaintiff had a full scale IQ score of 70 and 2008 school records indicated Plaintiff had a verbal IQ of 69. (Tr. 260, 408-09). The ALJ acknowledged Plaintiff's 2009 IQ score of 70, yet went on to find Plaintiff did not meet Listing 12.05(C) "because [Plaintiff] d[id] not have a valid verbal, performance, or full scale IQ of 60 through 70". (Tr. 22). The ALJ did not explain why she did not consider the 2009 score valid (although the assumption can be made it was because Dr. Leach determined Plaintiff had a full scale IQ of 74 eleven months later). (Tr. 505). Further, the ALJ did not mention Plaintiff's 2008 verbal IQ score of 69. Therefore, the ALJ erred by failing to sufficiently explain her treatment of any potentially qualifying IQ scores.

This error is relevant because the ALJ determined Plaintiff met the second part of section C, requiring Plaintiff have other significant work-related impairments. Indeed, the ALJ found Plaintiff had severe impairments at step two and also said he had a digestive system impairment that imposed significant work related limitations. (Tr. 21-22). These findings satisfy the "significant work-related limitation of function" requirement of 12.05(C). *Switzer v. Colvin*, 2014 U.S. Dist. LEXIS 79541, at *23-28 (N.D. Ohio). However, the analysis does not stop here.

Indeed, Plaintiff must also establish the "additional factors" in the diagnostic description – 1) subaverage intellectual functioning; 2) onset before the age of twenty-two; and 3) adaptive-

skills limitations. *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir. 2004) ("[T]wo IQ scores of 70, without more, does not satisfy the requirements of Listing 12.05(C)."). Each factor is addressed below.

First, Plaintiff must show subaverage intellectual functioning before age 22. Plaintiff points to his school records evidencing a history of receiving special education services through a cognitive disability program. (Doc. 14, at 12-13). However, poor academic performance, in and of itself, is not sufficient to warrant a finding of subaverage intellectual functioning before the age of twenty-two. *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009). More importantly, however, the ALJ's finding regarding intellectual functioning before age 22 is supported by substantial evidence in the record.

Indeed, Plaintiff's school records show he accepted supervisory authority and cooperated with others. (Tr. 25, 261). Plaintiff had the ability to follow verbal, written, multi-step directions with the ability to plan and organize and his gross and fine motor skills were normal. (Tr. 25-26, 260-61). Plaintiff was able to work independently and complete classroom work. (Tr. 26, 260-61). As further described below, the ALJ also looked to the record which demonstrated Plaintiff was capable of a range of daily activities and had less than marked deficits in abilities to function socially and maintain concentration, persistence, and pace. (Tr. 23).

In support of his argument that he had deficits in intellectual functioning onset before age 22, Plaintiff directs the Court to four IQ tests, which found he had a full scale IQ of 77 in 1997, 71 in 2008, 70 in 2009, and 74 in 2011. (Doc. 14, at 13; Tr. 260, 321, 408-09, 505). He claims his most recent score of 74 should not disqualify his prior reading of 70 because the margin of error does not preclude diagnosing intellectual disability in persons with IQs between 70 and 75. (Doc. 14, at 14). But, Plaintiff has not claimed, and the record does not show, that Plaintiff had

been diagnosed with intellectual disability. Rather, Plaintiff was consistently placed in the borderline range for intellectual disability. (Tr. 321, 408-09, 454-70). Moreover, Plaintiff has not claimed the ALJ is required to consider a margin of error where there is not a diagnosis of intellectual disability in the record.

Next, Plaintiff must show adaptive-skills limitations. The adaptive skills prong specifically evaluates social skills, communication skills, and daily-living skills. *Hayes*, 357 F. App'x at 677 (*citing Heller v. Doe*, 509 U.S. 312, 329 (1993)). Plaintiff directs the Court to Dr. Leach's January 2011 report, which found Plaintiff appeared "immature and simplistic in his thinking and behavior" and that Plaintiff was "still dependent upon his mother to assist him with reading, counting money, and assisting [him] in making decisions regarding his future". (Doc. 14, at 17; Tr. 506).

However, the ALJ indicated Plaintiff was able to complete numerous daily activities, including maintain a driver's license, drive, shop independently, wash dishes, do laundry, visit with and occasionally supervise his four young children, clean his room, rake leaves, microwave food, take out the trash, play cards, sing in a men's choir, and talk on the phone every day. (Tr. 26, 47-50, 308-10, 505-06). Moreover, Plaintiff testified he thought he could live on his own if necessary, was able to ride public transportation without getting lost unless he had to transfer to another bus line, and said he could read some parts of the newspaper and perform simple mathematical calculations. (Tr. 25, 55-56, 62).

In sum, while the Court finds the ALJ's analysis of Plaintiff's potentially qualifying IQ scores was insufficient, the ALJ's ultimate conclusion finding Plaintiff failed to satisfy listing 12.05(C) was not. This is because the ALJ adequately explained and supported with substantial evidence the reasons Plaintiff did not satisfy the diagnostic criteria of listing 12.05(C). *See*,

*Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (where remand would be an "idle and useless formality", the Court is not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.*, 395 U.S. 759, 766 n.6 (1969)). Therefore, the ALJ's step three conclusions should be affirmed.

***RFC Determination***

Next, Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence because she failed to consider consultative examiner Dr. Leach's opinion that Plaintiff would require additional supervision and structure. (Doc. 14, at 15). Relatedly, Plaintiff claims the ALJ improperly "omitted a significant portion of Dr. Bell's assessment", which stated Plaintiff would miss four-to-five days of work per month and would be limited to standing and walking for thirty minute intervals for a maximum of two hours per day. (Doc. 14, at 15-16).

However, the ALJ is not required to adopt a physician's opinion verbatim. 20 C.F.R. §§ 404.1546(c), 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). What is more, the ALJ's RFC is supported by substantial evidence.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545; 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. §§ 404.1529; 416.929. An ALJ must also consider and weigh medical opinions. §§ 404.1527; 416.927. When a claimant's statements about symptoms are not substantiated by objective

medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *1.

Here, the ALJ found Plaintiff had the RFC to perform a full range of work with certain nonexertional limitations and supported her conclusion with substantial evidence. (Tr. 23).

Indeed, the ALJ summarized Plaintiff's sometimes sporadic and generally conservative medical history. To this end, Plaintiff sustained a gunshot wound to the abdomen on April 3, 2007, but at a follow-up visit, the wound had completely healed. (Tr. 24, 373, 399). In fact, the treatment provider indicated Plaintiff could resume "full activity". *Id*. Plaintiff suffered a second gunshot wound on September 14, 2007, but he self-treated and said he was working on obtaining a GED and getting his life together. (Tr. 24, 396). In 2008, Plaintiff's only medical treatment was a May 15 office visit to address an STD. (Tr. 25, 390). In 2009, Plaintiff complained of cough and chest congestion in the emergency room, but physical examination demonstrated he was good health. (Tr. 25, 473). At a pain management appointment, Plaintiff's physical examination was unremarkable. (Tr. 25, 413-14). An x-ray of his abdomen revealed no obstruction and free air. (Tr. 25, 542). A CT scan of the abdomen showed no intraperitoneal free air or free fluid. (Tr. 25, 546). In 2010, Plaintiff said his abdominal pain was not bad, he could walk independently, and was cleared to return to normal activity. (Tr. 25, 551-52). Similarly, in 2011, Plaintiff's physical examination was within normal limits, he had no complaints, and reported his pain was well controlled with Tramadol and Miralax. (Tr. 25, 572).

Further, the ALJ found Plaintiff's complaints of debilitating pain to be less than credible. In support, the ALJ said contrary to Plaintiff's reports of severe stomach pain, physical examinations were normal and treatment records demonstrated adequate nutrition. (Tr. 26).

Additionally, the ALJ indicated Plaintiff received sporadic treatment throughout the years following his abdominal surgery and was generally able to control his symptoms by watching his diet. (Tr. 26). The ALJ also commented on Plaintiff's criminal record, including a history of committing crimes of dishonesty. (Tr. 26, 52-53).

Moreover, the ALJ considered opinion evidence of record to formulate the RFC. To this end, the ALJ afforded some weight to the opinions of nonexamining state agency physicians, who found plaintiff capable of a range of light work. (Tr. 26, 77-78, 92, 106-08, 120-22, 454-70). The ALJ afforded some weight to treating physician Dr. Bell's opinion. (Tr. 26, 657-60). However, she discredited parts of Dr. Bell's opinion because there was a significant gap in treatment records, where Dr. Bell saw Plaintiff in October 2010 then not again until March 2, 2012. *Id*. In addition, the ALJ pointed out that at the October 2010 visit, Dr. Bell noted Plaintiff was noncompliant with recommended diagnostic testing and surgery was not likely to be recommended. (Tr. 26-27, 544).

In sum, the ALJ supported the RFC finding with substantial evidence, including treatment records, opinion evidence, Plaintiff's testimony and credibility, and function reports. (Tr. 29). Therefore, Plaintiff's argument to the contrary should be found not well-taken. *See*, *Jones*, 336 F.3d at 477 (the Court must affirm even where substantial evidence supports an alternative result).

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying CIB and SSI benefits applied the correct legal

standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).